**KENTUCKY POWER COMPANY, Appellant,**

v.

**Myrtle CARTER, Appellee.**

Court of Appeals of Kentucky.

Feb. 27, 1959.

William I. Baird, Baird & Hays, Pikeville, for appellant.

E. D. Stephenson, Pikeville, for appellee.

SIMS, Judge.

Appellee, Mrs. Myrtle Carter, was severely injured by coming in contact with a wire charged with electricity which she averred was caused by the negligence of appellant, Kentucky Power Company (hereinafter referred to as the Company), and sued it for $10,202 damages. The first trial resulted in a hung jury and on a second trial she recovered judgment for $3,000.

The Company assigns five grounds for a reversal of the judgment, among which are that the court erred in failing to grant its motion for a directed verdict at the conclusion of the evidence and in failing to sustain its motion under CR 50.02 for judgment notwithstanding the verdict in the second trial; also, in failing to give it a directed verdict and in overruling its motion for judgment n. o. v. when the jury failed to agree in the first trial. As

we deem these grounds are meritorious, we will not consider the other four.

Mrs. Carter, with her husband and family, lived in a small house on Chloe Creek Road near the City of Pikeville. The Company maintained a pole on the edge of the road about 35 feet from the porch of the Carter home which carried three wires. The central wire was neutral and the wires on each side of it carried 2300 volts of electricity. On the side of this pole attached to the neutral wire was what is known as a "lead down wire" running to a metal stake in the ground. This lead wire had a covering to protect it from the weather, carried no current, and was a safety device. Around the pole and the "lead down wire" were two strands of wire clothes line; one of which ran to a tree in the Carter yard (which had grown around the wire) and then to a post on the Carter porch. The other wire clothes line went directly from the Company's pole to a post on the porch. These two clothes lines were some 5 or 6 feet above the ground and were so located when the Carters moved to the property in 1954. The Company was aware of these clothes lines, and some months before the accident, one of its employees had told Mrs. Carter, upon inquiry, that the clothes lines were safe, as the lead wire carried no current.

In the early afternoon of August 20, 1955, Lee Luster was attempting to erect an aluminum television antenna in the Carter yard. He had an iron pipe to which was attached the antenna. The pipe was leaning against the edge of the roof of the Carter house with the antenna on the roof. Luster climbed into the fork of the tree to which one of the clothes lines was attached. He had a six-foot length of wire around the pipe. He was endeavoring to raise the pipe with the antenna attached in order to fasten the pipe to the tree, which was only 21 feet tall. The transmission lines ran above the tree and were 30 feet 9 inches from the ground

at this point, while the pipe with the antenna attached measured 33 feet 1 inch.

The fork of the tree into which Luster had climbed was 10 or 12 feet from the ground. Both he and Mrs. Carter testified she was standing near the edge of the porch and some 6 feet from the tree watching him; while a witness for the Company, Carroll Johnson, testified she was standing at the foot of the tree assisting Luster. Luster pulled the wire attached to the pipe but testified he did not get the antenna off the roof and looked down and saw Mrs. Carter holding the clothes line. She had turned blue. He jumped out of the tree to go to her assistance and before he could reach her, the pipe fell across the clothes lines and the current knocked her several feet into a ditch at the side of the road. Mrs. Carter's testimony is that she casually put her hands on the clothes line which ran from the power-line pole to a post on the porch, and this is the last she remembers.

F. M. Baker, an electrical engineer and the Company's District Manager, was in his Pikeville office at the time of the accident and immediately went to the Carter home. He got on the roof of the house and examined the antenna for burns and found "a burn on one of the driver units where part of the aluminum had been melted out and the driver at that particular place was blackened. * * * It appeared to be fresh. The blackened oxide of the aluminum had not been disturbed. It looked like it was very fresh. It certainly had not been moved or carried around since that burn was on there." He testified this burn came from the high tension wire. Luster was there, talked with Baker and showed him his burned hand which he said he got while up in the tree pulling on this pipe in an attempt to raise the antenna.

Baker further testified that while he was at the scene of the accident he took hold of the clothes line Mrs. Carter had touched,

and it was "perfectly clear," meaning it was carrying no current. He described the construction of the power line and said it was properly constructed and contained no defects; that he looked at the "down lead wire" and there were no breaks in the covering on it except near the place it was attached to the metal stake in the ground.

Charles Campbell, an employee of the Company was on the scene with Baker the afternoon of the accident and his testimony was practically the same as Baker's. Bill Barnett, Safety Director of the Company, went to the Carter home with Baker and his testimony also corroborated Baker's. That afternoon Barnett took two pictures of the fresh burn on the antenna, which are practically identical, and they clearly show the black spot on the antenna which the Company's witnesses say evidenced the burn. Later, Barnett took some pictures of the pole showing the "lead down wire" and they show no break in the covering except at the bottom of the pole. It is significant that during the second trial Barnett testified that part of the weatherproof covering had been removed from the lead down wire "at almost the point where this clothes line was around (the pole) and shiny copper wire was bare there." He was corroborated by several witnesses.

On October 11, 1955, Ralph Damron, an employee of the Company, was at the Carter home with a transit making some measurements of the distance the power line was above the ground at the place of the accident. In looking through the transit, (which has the effect of looking through a telescope), he saw on one of the wires just over the place of the accident "an aluminum place bright on there, it was still shining."

Carroll Johnson, who was living right across the road from the Carter home, testified he saw Luster raise the antenna from the tree; that "They had it up straight in the air towards that high power line and I hollered at Lee and told him he better turn that thing around. * * * He said if he needed my help, he would holler for me." Luster denied this.

On the first trial Luster testified his hand was burned while he was in the tree trying to raise the iron pipe, but on the second trial he denied his hand was burned. When confronted with his testimony on the first trial, he said it had been incorrectly reported.

With the evidence contradictory as to whether the antenna was raised off the roof so as to contact the high tension wires, the submission of the case to the jury would have been proper had it not been that the physical facts show positively that the antenna attached to the pipe came in contact with the high tension wire. First, the clothes lines had been attached to the pole all the year and a half Mrs. Carter had lived in this house without the clothes lines becoming "energized". Second, on the afternoon of the accident and right after it happened, Baker and Barnett touched the "lead down wire" and neither it nor the clothes lines carried any electrical current. Third, the aluminum antenna showed a fresh burn immediately following the accident. Fourth, on October 11th, following the accident on August 20th, one of the high tension wires over the place of the accident while being viewed through a transit showed an aluminum spot on it. These physical facts indisputably show the antenna had come in contact with the high tension wire and that the pipe to which it was attached touched the clothes line Mrs. Carter had her hands on. Such facts destroyed the testimony of Luster.

In Lambert v. Miller's Adm'r, 277 Ky. 64, 125 S.W.2d 1019, at page 1023, this excerpt was taken from Louisville & N. R. Co. v. Welsh, 272 Ky. 120, 113 S.W.2d 879, 888:

"When physical situations of matters of common knowledge point so certainly to the truth as to leave no room for

a contrary determination, based on reason and common sense, such physical situation and reasonable probabilities are not affected by sworn testimony which, in mere words, conflicts therewith."

 Due to the dangerous nature of electricity, the Company is chargeable with the highest degree of care to protect all persons in all places they have a right to be. Generally, a company is not liable where no injurious consequences would be reasonably perceived, or the act complained of reasonably anticipated. Nor is a company liable if the injury occurred through some independent or unrelated and efficient cause. In the instant case, the condition which made the accident possible (the power line running over the tree) cannot be the proximate cause. See Morton's Adm'r v. Ky.-Tenn. L. & P. Co., 282 Ky. 174, 138 S.W.2d 345, where many authorities are cited and discussed. The instant case is quite different from Green River Rural Electric Co-op. Corp. v. Blandford, 306 Ky. 125, 206 S.W.2d 475, as there the power line ran through the branches of a tree over a well, while here the power line was 10 feet above the top of the tree to which the antenna was to be attached. The instant case is more like Vaught's Adm'x v. Ky. Utilities Co., Ky., 296 S.W.2d 459, where the power line was in a field 23½ feet above the concrete cover of the well, and it was there held that the company was not liable for the death of one removing a 26-foot pipe from the well which came in contact with the power line.

We gather from Mrs. Carter's brief that she is not seriously contending the power line was strung too low over her premises, and she insists that the antenna did not come in contact with the Company's wires. Her contention seems to be that the clothes line became electrified from the "lead down wire." However, the physical fact that the antenna showed a burn, and one of the high tension wires over the place of the accident showed a bright aluminum spot on it, proves the antenna did come in contact with the power line. And the further fact that right after the accident neither the lead wire nor the clothes line was electrified, refutes her contention that the accident was caused by any defect in the lead wire.

The court erred in not directing a verdict for the Company at the conclusion of all the evidence, and it follows that he should have sustained the Company's motion under CR 50.02 made for a judgment notwithstanding the verdict.

The judgment is reversed with directions that one be entered for the Company.