**C.G. BRYANT and Hal Bryant, d/b/a Bryant Lumber Company, Plaintiffs,**

v.

**TRI–COUNTY ELECTRIC MEMBERSHIP CORPORATION and Kuhlman Corporation, Defendants.**

**Civ. A. No. C90–0149–BG(H).**

United States District Court, W.D. Kentucky, at Bowling Green.

Feb. 2, 1994.

David W. Anderson, Harned, Anderson & Backhert, Bowling Green, KY, Hunter C. Quick, Cozen & Connor, Charlotte, NC, for plaintiffs.

Whayne C. Priest, Jr., Kurt W. Maier, English, Lucas, Priest & Owsley, Bowling Green, KY, J. Christopher Hopgood, John S. Hoffman, Sheffer, Hoffman, Thomason & Morton, Henderson, KY, for defendants.

## MEMORANDUM OPINION

HEYBURN, District Judge.

Plaintiffs, C.G. Bryant and Hal Bryant, brought this diversity action in negligence, warranty and strict liability against their local utility company, Tri–County Electric Membership Corporation, and the manufacturer of electrical transformers, Kuhlman Corporation, for property damage sustained in connection with a fire that consumed Plaintiffs' sawmill. Defendant Tri–County Electric moves for summary judgment on the implied warranty and strict liability claims on the ground that Kentucky law imposes only negligence liability on a utility company for careless transmissions of an electric current. Defendant Kuhlman moves for summary judgment for its part contending that Plaintiffs' evidence fails to create an issue of material fact that it manufactured the electrical transformer that allegedly caused the sawmill blaze. For reasons set forth herein, the Court will allow Plaintiffs to maintain all their claims against Tri–County Electric but will dismiss Plaintiffs' claims against Defendant Kuhlman.

### I.

A fire destroyed Plaintiffs' sawmill in April 1988, causing over $300,000 in damages. The fire began when a switch attached to a lumber-surfacing machine exploded. Plaintiffs suspect that the switch's failure resulted from a series of voltage surges that plagued the sawmill in the years preceding the fire. These voltage spikes, Plaintiffs contend, passed through their electric meter and gradually destroyed the switch's insulation.

Plaintiffs had experienced significant irregularities in their electrical supply by late 1986. Motors in heavy equipment and computers burned out with alarming frequency. The transformers regulating the current entering Plaintiffs' facility emitted an unusually loud hum. An oscilloscope registered voltage surges when attached to Plaintiffs' machinery. In October 1986, Tri–County sought to eliminate these problems by removing the transformers then in service and installing transformers manufactured by Kuhlman.[1]

This replacement improved Plaintiffs' power supply, but did not successfully eliminate all symptoms of erratic voltage. Plaintiffs continued to suffer occasional voltage-related motor failures throughout the period between October 1986 and the April 1988 fire. Plaintiffs contend that the fire resulted from "the failure of Tri–County ... to properly and adequately supply electric power to

---

1. Plaintiffs have been unable to identify the manufacturer of the transformers in service before October 1986. See the discussion in Part III of this Memorandum Opinion, below.

[Plaintiffs]; and [from] the failure of or a defect in the transformers installed at [Plaintiffs' facility] and ... manufactured by Kuhlman." (Pls.' Resp. to Kuhlman's Mot. for Summ.J. at 2.)

## II.

Tri–County contends that Kentucky law does not impose liability on a producer of defective electrical current absent proof of negligence.[2] Since Kentucky has not yet declared whether principles of strict liability might apply to injuries caused by electricity, the resolution of Tri–County's Motion will require this Court to "analyze the indications and determine the path that [the] state would follow" were Kentucky to decide the issue itself. *Overstreet v. Norden Lab.*, 669 F.2d 1286, 1290 (6th Cir.1982); *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). This Court has examined numerous decisions of other state courts that articulate the fundamental themes of strict liability and two Kentucky decisions in related contexts. On the basis of these announced legal principles as well as policy considerations, the Court concludes that Kentucky would apply strict liability concepts in the circumstances of this case.

### A.

■ Strict liability principles permit recovery when an injury results from either the manufacture of an unreasonably dangerous product or a business's "abnormally dangerous" activity. Under Kentucky law, the latter form of liability, which one might call

"strict service liability," does not apply to the distribution of electricity. *Kentucky Util. Co. v. Auto Crane Co.*, 674 S.W.2d 15, 18 (Ky.App.1983). Kentucky has not, however, addressed the first type of liability, generally referred to as "strict product liability," which other jurisdictions have held may regulate some parts of an electric company's transmissions.

This "strict product liability" applies generally to an entity that "*sells* any *product* in a *defective* condition [which renders the product] *unreasonably dangerous*" causing injuries. *Restatement (Second) of Torts* § 402A (emphasis added), *adopted by Dealers Transp. Co. v. Battery Distrib. Co.*, 402 S.W.2d 441, 446–47 (Ky.1965). Opinions applying this product liability formula specifically to distributors of electricity focus on three dispositive legal questions: (1) Is electricity a "product"? If so, (2) When is electricity "sold", such that the principles of product liability might first apply? And finally, (3) When does electricity contain a "defect" that renders it "unreasonably dangerous"?[3]

The majority of the state courts considering this issue have encountered little difficulty deciding that electricity is a product.[4] These courts declare, for example, that electricity is "a form of energy that can be made or produced by men, confined, controlled, transmitted and distributed...." *Ransome v. Wisconsin Elec. Power Co.*, 87 Wis.2d 605, 275 N.W.2d 641, 643 (1979).[5]

---

**2.** A utility clearly faces liability if its negligence results in injury. Kentucky law requires producers of electricity to "exercise the utmost care and skill to protect their patrons and the public against danger and harm." *Kentucky Power Co. v. Kilbourn*, 307 S.W.2d 9, 12 (Ky.1957); *see also Kentucky Power Co. v. Carter*, 321 S.W.2d 410, 413 (Ky.1959).

**3.** Strict liability in warranty exists when a manufacturer enters a contract for the *sale* of *goods* that are *unfit* for ordinary use. Ky.Rev.Stat. § 355.2–314(2)(c) (emphasis added). The availability of warranty relief in this case should therefore depend upon the same analysis that governs strict liability in tort: Tri–County should not shoulder liability unless it *sold* a *product* that was *defective*. *See Aversa v. Public Service Elec.*

*& Gas Co.*, 186 N.J.Super. 130, 451 A.2d 976, 979, n. 2 (Law Div.1982).

**4.** See complete summary of cases at footnote 6.

**5.** At least two states, however, flatly reject this definition, declaring instead that customers of electric utilities purchase a service, not a product. *See Otte v. Dayton Power & Light Co.*, 37 Ohio St.3d 33, 523 N.E.2d 835, 838 (1988); *Bowen v. Niagara Mohawk Power Corp.*, 183 A.D.2d 293, 590 N.Y.S.2d 628, 631–32 (1992). Injuries caused by voltage surges in these states are governed exclusively by negligence standards. *See McKee v. Cutter Lab.*, 866 F.2d 219, 222 (6th Cir.1989) (defendant who causes injury while rendering a service is not subject to regulation under strict liability standards).

Even so, electricity is subject to product liability rules only after it is "sold" to the consumer. Although identifying the moment of sale is a more challenging task, a reasonable consensus prevails: electricity is typically held to be "sold" when it passes through the customer's meter. *See, e.g., Ransome*, 275 N.W.2d at 643, 649. It is at this moment that the customer's charges are computed, the seller relinquishes control over its product, and the electricity has been reduced to a voltage suitable for ordinary use. *Id.; Aversa v. Public Serv. Elec. & Gas Co.*, 186 N.J.Super. 130, 451 A.2d 976, 980 (Law Div. 1982); *Smith v. Home Light & Power Co.*, 734 P.2d 1051, 1055 (Col.1987). Put another way, strict liability typically applies, if at all, only to injuries suffered *inside* the home or business, not to those experienced *outside*. *See, e.g., Pierce v. Pacific Gas & Elec. Co.*, 166 Cal.App.3d 68, 212 Cal.Rptr. 283, 292 (1985) (excluding "antenna" and "downed-power-line" injuries from product liability's scope).[6]

■ A product is sold in a "defective condition unreasonably dangerous" under Kentucky law when "the product creates such a risk of accident that an ordinarily prudent company ... would not have put it on the market." *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780 (Ky.1984)

(emphasis and internal punctuation omitted). Courts in other jurisdictions generally declare that electric voltage far in excess of the level intended by the utility and expected by the customer is dangerously defective. *See Pierce*, 212 Cal.Rptr. at 287. On the other hand, a defective current might not reach "unreasonably dangerous" proportions if the threat posed by the defect can be minimized most economically by the consumer rather than by the utility. *See Elgin Airport Inn, Inc. v. Commonwealth Edison Co.*, 89 Ill.2d 138, 59 Ill.Dec. 675, 677–78, 432 N.E.2d 259, 261–62 (1982) (current in "single phase" rather than "three phase" not unreasonably dangerous). Where the consumer is better able to eliminate the defect, the policies underlying the assignment of liability without fault—placing liability on the party best able to prevent the damage, and spreading the risk of loss—would not justify penalizing the utility. *Id.*[7]

## B.

■ The Kentucky courts have shown themselves willing to permit recovery under negligence standards when a utility transmits voltage either in excess of, or far below, ordinary levels, and such voltage causes harm inside or outside the home.[8] But

6. At least ten states have considered the applicability of strict liability principles to electricity. Of these ten, eight states have determined that electricity is a "product", and that electricity is "sold" by its passage through the customer's meter. These states are: California, *see Pierce v. Pacific Gas & Elec. Co.*, 166 Cal.App.3d 68, 212 Cal.Rptr. 283, 290, 292 (1985); Colorado, *see Smith v. Home Light & Power Co.*, 734 P.2d 1051, 1054–55 (Col.1987); Connecticut, *see Carbone v. Connecticut Light & Power Co.*, 40 Conn.Sup. 120, 482 A.2d 722, 723 (1984); Indiana, *see Petroski v. Northern Ind. Pub. Serv. Co.*, 171 Ind. App. 14, 354 N.E.2d 736, 747 (1976); New Jersey, *see Aversa v. Public Service Elec. & Gas Co.*, 186 N.J.Super. 130, 451 A.2d 976, 979–80 (Law Div.1982); Pennsylvania, *see Smithbower v. Southwest Central Rural Elec. Coop.*, 374 Pa.Super. 46, 542 A.2d 140, 143 (1988); Texas, *see Houston Lighting & Power Co. v. Reynolds*, 765 S.W.2d 784, 785–86 (Tex.1988); and Wisconsin, *see Ransome v. Wisconsin Elec. Power Co.*, 87 Wis.2d 605, 275 N.W.2d 641, 643, 648–49 (1979). As noted above, at least two states hold that strict liability rules never apply to producers of electricity: Ohio, *see Otte v. Dayton Power & Light Co.*, 37 Ohio St.3d 835, 523 N.E.2d 835,

838 (1988), and New York, *see Bowen v. Niagara Mohawk Power Corp.*, 183 A.D.2d 293, 590 N.Y.S.2d 628, 631–32 (1992).

7. Consider in this context the Wisconsin court's finding in *Ransome* that a current of 4800 volts is unreasonably dangerous because the circuit breakers used by ordinary consumers cannot protect homes from currents in excess of 600 volts. *Ransome*, 275 N.W.2d at 649. Perhaps the *Ransome* court would have reached a different conclusion if the damaging current had been, say, 500 volts. That voltage, since it would have exceeded the ordinary supply of 120–240 volts, would have rendered the current "defective"; however, since currents of up to 600 volts could be controlled most economically by the consumer, the electricity might not have been held "unreasonably dangerous."

8. *See Kilbourn*, 307 S.W.2d at 10–11 (low voltage causing damage inside the home) *and Carter*, 321 S.W.2d at 413 (high tension wire causing injury outside the home may result in liability; defendant utility not found negligent under particular circumstances presented).

would the Kentucky courts follow the concerns of other jurisdictions and apply strict liability principles to injuries resulting from a defective power supply? Two opinions discussing Kentucky law merit close attention, though neither is binding on this Court.

The Kentucky Court of Appeals' decision in *Kentucky Utilities Co. v. Auto Crane Co.* comes closest to discussing the application of product liability principles to harm caused by electricity. The plaintiff in that lawsuit suffered severe injuries when the crane he was operating touched a high-tension wire. *Auto Crane*, 674 S.W.2d at 16. The court declared that Kentucky law does not consider the transmission of electricity to be an "abnormally dangerous activity" subject to strict *service* liability under *Restatement* §§ 520–21. *Id.* at 18.

Although the court did not address whether electricity might be governed by strict *product* liability rules, neither *Auto Crane*'s reasoning nor its authority is fundamentally hostile to an application of product liability principles to injuries caused by electricity. The declaration in *Auto Crane* that the transmission of electricity is not an abnormally dangerous activity does not rest upon a determination that electricity is never a "product" subject to regulation by strict liability principles. Nor does *Auto Crane* necessarily reject the distinction drawn by most state courts between electricity en route to a customer's meter and electricity which has been "sold" by its passage through the meter. *Auto Crane* examined the liability of a power company for an injury that had occurred outside the home, while the current was still in its transit or in the service stage. Virtually every state court to address the issue has held, consistent with the result reached in *Auto Crane*, that harm caused by electricity which has not yet reached the customer's meter is governed exclusively by negligence principles. *Auto Crane* did not

examine the legal responsibility of a utility whose electricity had passed through the customer's meter before it caused injury. The Kentucky courts could therefore apply § 402A to harm triggered by electricity inside a customer's home without offending the logic or conclusion in *Auto Crane*.

Not long ago, however, another judge in this Court declared that Kentucky law would not hold the defendant utility strictly liable for damage caused to a farmer's cattle by the utility's "stray voltage" transmissions. *G & K Dairy v. Princeton Elec. Plant Bd.*, 781 F.Supp. 485, 487, 489 (W.D.Ky.1991), (Siler, J.). Depending heavily on *Auto Crane* and on the Ohio Supreme Court's analysis in *Otte, see supra*, Judge Siler concluded that because stray voltage is not a "product" under Kentucky law, the service of distributing energy may be measured solely by negligence standards. *Id.* at 489–90. Judge Siler's thoughtful ruling would, no doubt, be found highly persuasive by a Kentucky court called upon to consider the same issues.

Given the different circumstances of this case, however, this Court does not believe that the *G & K Dairy* opinion calls for the same result. Judge Siler contemplated the liability of a power company for *stray* voltage in *G & K Dairy;* that is, he evaluated the liability of a producer of electric power for injuries caused by stray electricity that did not form part of the current ordinarily purchased and used by the company's customers. *Id.*, 781 F.Supp. at 489–90. He observed that "[s]tray voltage is an inherent by-product of every electrical transmission system" which is "neither marketed nor marketable"; the defendant utility was "not in the business of selling stray voltage, and it did not sell stray voltage to the plaintiffs." *Id.* He concluded that such voltage was not a "product" subject to strict liability oversight. *Id.* at 489.[9]

9. The stray voltage in *G & K Dairy* apparently had *not* passed through the plaintiff's meter before causing injury. *G & K Dairy*, 781 F.Supp. at 490. Thus the majority rule described above would have dictated the result reached by *G & K Dairy:* strict liability does not govern injuries caused by non-metered electricity. Put another way, *G & K Dairy* might not apply to a case where, as here, the damaging electricity *had*

passed through the customer's meter. But this observation becomes less significant in light of the *G & K Dairy* holding that stray voltage is not a "product." An injury caused by a non-product could not result in strict liability, regardless of its status as "sold" (metered) or "unsold" (non-metered). Indeed, *G & K Dairy* found extensive guidance in an Ohio Supreme Court opinion which had held that injuries caused by stray

· The unique characteristics of the stray voltage limit the applicability of *G & K Dairy*'s analysis to circumstances where, as in the present litigation, injury results from ordinary electricity. Stray voltage is not an independently useable product. It is more by-product than product. Stray voltage is not marketed by utilities; it is not bargained for by customers; it cannot be used and is not paid for, even when it passes through the customer's meter. The current that alleged-ly caused injury in this lawsuit, by contrast, was ordinary electricity. Tri–County mar-kets such electricity and its customers pur-chase and use that current. Ordinary elec-tricity is therefore a "product" in virtually every respect that stray voltage is *not* a product. While this Court might not depart from the excellent reasoning of *G & K Dairy* were it confronted by injuries caused by stray voltage, that is not the case here. Upon such narrow but significant factual dif-ferences, this Court finds a reasonable, ap-propriate and workable legal distinction.

### C.

Careful consideration of the many opinions in this field persuades the Court that Ken-tucky courts, under appropriate circum-stances, would follow the majority rule that considers ordinary electricity to be a "prod-uct", and would adopt the view that electrici-ty is "sold", and first becomes subject to strict liability oversight, when it passes through a customer's meter. These rules provide a logical basis for determining the electric company's liability. The general view holding electricity to be a "product" sensibly accounts for the fact that electricity is created, harnessed, measured, transported, bought and sold, like products generally. The "meter as the point of sale" rule has the merit of creating a bright line between inju-ries resulting from the *service* of transmit-ting electricity—that is, injuries due to con-tact with electricity *before* the current reach-es its intended destination—and damage re-sulting from the *product* of electricity itself—

that is, injuries caused by defective electrici-ty after the current has been purchased by the customer.

Kentucky's longstanding policies of pro-tecting consumers and spreading risk en-courage the state's courts to apply product liability standards to electricity. The citi-zen's dependence upon, and vulnerability to, electricity is almost without parallel in mod-ern life. The consumer must purchase elec-tricity and yet cannot possibly inspect the product before buying it or putting it to use. Indeed, a defect in electrical current often reveals itself only when it causes a catastro-phe. Consumers therefore cannot avoid the purchase of defective electricity and cannot protect themselves from harm in the event the utility sells them a dangerous current. It cannot be doubted that producers of elec-tricity, perhaps more than other sellers of goods, have "undertaken and assumed a spe-cial responsibility toward any member of the consuming public who may be injured" by their product. *Embs v. Pepsi–Cola Bottling Co.*, 528 S.W.2d 703, 705 (Ky.1975). The Kentucky courts would therefore probably conclude, in concert with the decisions of most other states, that the imposition of strict liability upon electric utilities will ad-vance the twin policies of spreading the risk of loss among all product consumers and discouraging the sale of defective goods. *Id.;* see also *Pierce*, 212 Cal.Rptr. at 291–92 *and Ransome*, 275 N.W.2d at 650.

Before concluding its analysis, the Court has considered whether any characteristics of electric power make the application of strict liability inappropriate to it. The Court has considered the development of strict liability from some of its most renowned formula-tions. *See Escola v. Coca Cola Bottling Co.*, 24 Cal.2d 453, 150 P.2d 436, 444 (1944) (Tray-nor, J. concurring); *Greenman v. Yuba Pow-er Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963) (Traynor, J.). Like other well made products, electricity pres-ents an intermittent and haphazard risk to

voltage which *had* passed through the customer's meter could *not* subject the defendant utility to strict liability. *See Otte*, 523 N.E.2d at 838–39, cited by *G & K Dairy*, 781 F.Supp. at 489. It is therefore quite likely that the *G & K Dairy* opin-ion would refuse to apply strict liability princi-ples to injuries caused by stray voltage without regard for the fact that the stray electricity had, or had not, passed through the customer's meter.

consumers. Consumers are encouraged to believe that electric power is safe and are given assurance in this belief by government regulation. Because electric companies deliver their product as part of a government regulated monopoly, consumers have no reason to be suspicious of the product nor any method to change their source if they are dissatisfied. Consequently, the theory of strict liability and the policy of risk spreading apply in the same manner to electricity as it does to any traditional product.

Some courts have found an unfairness in the imposition of strict liability upon a utility which must seek government approval to raise its rates and which may not be entitled to include these expenses as part of its costs. *See Otte,* at 841. But the application of this rule is neither unfair nor overburdensome to utilities, even without the ability to pass along its expenses. For one thing, the "unreasonably dangerous" standard is a particularly difficult hurdle as applied to electricity. The law recognizes that electric power is not completely uniform and correctly allows a greater deviation before determining that it may be unreasonably dangerous. Moreover, Plaintiffs must still show a defect. The self-destroying character of electricity and the usual absence of electricity monitoring devices are additional hurdles of proof making these difficult cases. These factors also argue for the fairness in the strict liability approach.

In sum, the court perceives no policy rationale for not applying strict liability in these circumstances. The Court shall accordingly deny Tri–County's Motion to Dismiss.

## D.

The fact that Plaintiffs *may* recover from Tri–County under strict liability principles is not to say that Plaintiffs *will* recover on the basis of the evidence presented thus far in this lawsuit. The Court recognizes that in some respects electricity is different from traditional products. These real differences will be considered by the Court and by the jury.

Although the definition of electricity as a "product" is a legal question, the distinction between ordinary electricity (a "product") and stray voltage (an incident of the service of transmission) is fact-oriented. Thus, if the evidence is such that reasonable persons could differ on the nature of the electricity that caused Plaintiffs' injuries, that issue is properly one for the jury's attention, and might ultimately lead to a verdict in Tri–County's favor. Whether the injurious current passed through Plaintiffs' meter before causing harm is likewise a question of fact.

The most interesting legal and factual question will focus on whether the allegedly damaging electricity was so "defective" as to be "unreasonably dangerous." The Court will not now attempt to design a precise definition of "unreasonably dangerous defect" in the context of electricity. The Court will propose, however, that if the defect established by Plaintiffs could have been mitigated most economically by Plaintiffs rather than Tri–County—if the voltage surges allegedly entering Plaintiffs' business varied only minimally from the normal current, for example, and occurred only rarely—then that defect might not be sufficient to render the current unreasonably dangerous. *See Elgin Airport Inn, supra,* 59 Ill.Dec. at 678, 432 N.E.2d at 262.

## III.

■ Plaintiffs allege that the voltage surges which triggered the 1988 fire resulted, at least in part, from defective transformers in operation outside Plaintiffs' business prior to October 1986. Plaintiffs therefore would hold a transformer manufacturer, Kuhlman, liable for damages that resulted from the use of these allegedly substandard transformers. Kuhlman insists, however, that Plaintiffs' cause of action cannot survive their failure to introduce evidence that Kuhlman manufactured the defective transformers. The Court agrees.[10]

**10.** Kuhlman's identity as manufacturer of the transformers installed in 1986 and presently in service is undisputed. At the Court's direction, Plaintiffs have recently examined these trans- formers and have concluded that they are not defective. (Pls.' Clarification of Supplemental Resp. at 2.) Although Plaintiffs once contended that these transformers helped cause the 1988

Plaintiffs have introduced considerable evidence suggesting that the transformers in place prior to October 1986 were defective, and that those defects contributed to the 1988 fire. Plaintiffs admit, however, that they cannot directly prove that Kuhlman manufactured these transformers. Plaintiffs write:

> Unfortunately, plaintiff[s] do[ ] not know the identity of the transformers which were removed in October, 1986. Plaintiff[s] attempted to discover the identity of these transformers but incredibly, Tri–County ... stated that it had no records regarding these transformers, even though they 'were removed and replaced in 1986, were then tested and found to have been in proper working order and were placed back in Tri–County's system.' Consequently, plaintiff[s] ha[ve] done everything [they] possibly can to discover the identity of these transformers and [are] incredulous at Tri–County's inability to identify these.

(Pls.' Resp. at 4 (emphasis and internal citations omitted).) Plaintiffs remain confident, though, that the law should hold Kuhlman liable for defects in those pre-October 1986 transformers. "[T]here is a legitimate question of fact that Kuhlman manufactured the original transformers," Plaintiffs write:

> [I]t is undisputed that Tri–County ... purchased Kuhlman transformers in 1986.... Tri–County had approximately 25,000 transformers in service in 1986, but ... only purchased transformers from about six different manufacturers. Therefore, plaintiff[s] believe[ ] that a sufficient enough question of fact remains as to whether the transformers removed in October, 1986 were Kuhlman transformers.

(Id.; see also Pls.' Clarification of Supplemental Resp. at 2–3.)

The Court must disagree with Plaintiffs' analysis. The simple fact that Kuhlman was one of a limited number of transformer suppliers does not, by itself, support an inference that Kuhlman manufactured the defective transformers that were in operation prior to October 1986. The fact that Tri–County's allegedly careless record-keeping prevents Plaintiffs from identifying the maker of the pre-October 1986 transformers does not justify holding Kuhlman liable for equipment that it may not have made. Plaintiffs offer no evidence regarding the distinctive characteristics of the original transformers which would allow a reasonable jury to decide that they were made by Kuhlman rather than by any one of five other manufacturers.

Kentucky law simply does not permit a jury to hold a party liable on the strength of a one-in-six possibility that the party acted irresponsibly. See Cox v. Cooper, 510 S.W.2d 530, 534 (Ky.1974). Nor can Plaintiffs realistically contend that Kuhlman may be held liable, under concert of action principles, for a defective transformer produced by another manufacturer. See Farmer v. City of Newport, 748 S.W.2d 162, 164–65 (Ky.App.1988). Even the most favorable view of the evidence leads to the unavoidable conclusion that Plaintiffs cannot identify Kuhlman as the manufacturer of the transformers that allegedly contributed to Plaintiffs' injuries.

Summary judgment is appropriate where, as here, the evidence on an issue governing the outcome of the lawsuit is insufficient to allow a reasonable jury to return a verdict for the nonmoving party. Fed.R.Civ.P. 56; Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court shall therefore dismiss Plaintiffs' claim against Kuhlman.

The Court will enter an appropriate order consistent with this Memorandum Opinion.

---

fire, (see Pls.' Resp. to Kuhlman's Mot. for Summ. J. at 5), Plaintiffs no longer appear to argue that Kuhlman's liability can be premised on its status as manufacturer of the existing transformers. (See Pls.' Clarification at 3 ("'[S]ince the existing transformers demonstrate no evidence of a defect, the voltage problems existing after October, 1986 could only have been caused by the negligence of Tri–County or by defects in Tri–County's equipment....'").) Thus Kuhlman can be held liable, if at all, only in its capacity as manufacturer of the transformers in service outside Plaintiffs' sawmill before October 1986.

## ORDER

This matter is before the Court on Motions for Summary Judgment filed by Defendant Tri–County Electric and by Defendant Kuhlman. The Court, having thoroughly reviewed this matter, having set forth its views in a Memorandum Opinion, and being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendant Tri–County Electric's Alternative Motion for Summary Judgment, which requests dismissal of Plaintiffs' strict liability causes of action, is **OVERRULED.**

IT IS FURTHER ORDERED that Defendant Tri–County Electric's Motion for Summary Judgment dated May 12, 1993, which contends that Plaintiffs' evidence fails as a matter of law to support a judgment against Defendant, is **OVERRULED.**

IT IS FURTHER ORDERED that Defendant Kuhlman's Motion for Summary Judgment is **SUSTAINED** and Plaintiffs' cause of action against Defendant Kuhlman is **DISMISSED** with prejudice.

Those matters not disposed of by this Order are retained on the Court's docket for trial commencing February 17, 1994.

**POSTSCRIPT:** A jury trial of this lawsuit took place in February 1994, and concluded with a verdict in favor of Defendant Tri–County Electric on all causes of action, including Plaintiffs' strict liability claim.