186 N.J. Super. 130 (1982)
451 A.2d 976
MARIO AVERSA AND GLORIA AVERSA, HIS WIFE, PLAINTIFFS,
v.
PUBLIC SERVICE ELECTRIC AND GAS CO., A CORPORATION OF THE STATE OF NEW JERSEY; AND LIBERTY MUTUAL INSURANCE CO., DEFENDANTS. PETER FRANKOWSKI AND SHIRLEY FRANKOWSKI, PLAINTIFFS,
v.
PUBLIC SERVICE ELECTRIC AND GAS CO., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division Passaic County.
Decided July 6, 1982.
*131 Reginald F. Hopkinson for plaintiffs Aversa (Jeffer, Hopkinson & Vogel, attorneys).
Max D. Forrest for plaintiffs Frankowski (Marcus & Levy, attorneys).
William E. Frese for defendant Public Service Electric and Gas Company.
MARTIN, J.S.C.
Defendant Public Service Electric & Gas Co. (P.S.E. & G.) seeks to dismiss, on motion, those counts of both plaintiffs' personal injury complaints alleging strict liability in tort, and implied warranty of merchantability and fitness for particular use, as being inapplicable as a matter of law.
Plaintiff Mario Aversa has been employed by Whippany Paper Board Co., Inc. (Whippany) for about four years as an electrical maintenance worker. Upon arriving for work on June 19, 1979 he was advised of an "electrical shutdown" and that his supervisor was looking for him. Plaintiff proceeded to the "powerhouse," which is a location inside the plant where Whippany generated its own electric power at a maximum capacity of 480 volts. At the "powerhouse" plaintiff was advised that his supervisor was outside the building. He found his supervisor and a few other employees outside, around a separate small structure known as the "switchhouse" or "vault." P.S.E. & G. provided a back-up service to Whippany's electric generator system which tied in at the "switchhouse." Plaintiff was instructed by his supervisor to measure and see if any power was entering the switchhouse. Plaintiff returned to the plant to obtain testing equipment, which had a maximum capacity to measure 600 volts, and returned to the switchhouse. He had never been inside or worked around the switchhouse before. Plaintiff entered the switchhouse with a coemployee, plaintiff Peter Frankowski. Once inside the switchhouse Aversa looked for notices or warnings as to the voltage in the switchhouse, and *132 seeing none, proceeded to the primary service wire, climbed two or three steps up a ladder and placed his voltage testing meter at a point directly above the disconnect switch. An electrical flash occurred whereby Aversa sustained the force of the electrical arc in the upper part of his body. Plaintiff Frankowski was thrown back from the force of the flash.
The electrical input at Aversa's contact point was 4,160 volts. Although he alleges there were no warnings or notices inside the switchhouse concerning the existence of 4,160 volts, a sign reading "Danger High Voltage" was attached to the entrance door which he alleges could not be seen at the time of the accident because the door opened outward leaving only the inside of the door visible.
A factual dispute exists as to the ownership, control and maintenance of the electrical equipment inside the switchhouse. For the purposes of this motion, the court is required to view the facts in a light most favorable to the party resisting summary judgment and against the moving party. Hume v. Bayer, 178 N.J. Super. 310, 312 (Law Div. 1981); Ruvolo v. American Cas. Co., 39 N.J. 490 (1963); Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67 (1954).[1]
*133 The electricity supply was brought into the switchhouse from the nearest utility pole by an aerial drop line provided by defendant. This line was spliced to another outside the switchhouse, which ran through a conduit pipe to the inside of the switchhouse. After the electricity went through the meters, it was stepped-down by transformers located directly outside the switchhouse, from 4,160 to 480 volts.
Plaintiffs aver that in failing to lock and seal the circuit breakers and in failing to provide proper directions as to the safe use of their product, electric power, introduced into the stream of commerce, defendant is liable on the basis of strict liability since the product was improperly designed, and further breached its implied warranties of merchantability and fitness for particular use. Defendant's motion for summary judgment asserts that a strict liability, as well as an implied warranty, cause of action is inapplicable against an electric utility, inasmuch as liability concerning the escape of electrical current is tested only by reasonable care and foreseeability standards.
Defendant relies upon Black v. Public Service Elec. & Gas Co., 98 N.J. Super. 366 (App.Div. 1968), rev'd 56 N.J. 63 (1970), as well as several out-of-state cases, for the proposition that the liability of electric companies must be based on negligence and not strict liability principles. In Black plaintiff sought damages under the Wrongful Death Act from an electric company where decedent was killed when a crane with which he was working came in contact with a high voltage overhead wire. The court held that the test of liability is whether, under the particular circumstances, the injury ought reasonably to have been anticipated, with due regard to reasonably probable contingencies. Id. 98 N.J. Super. at 372. It specified that the liability of utilities is grounded in the failure to exercise due care, noting that an overly strict standard of care would make the electric company virtually an *134 insurer, "contrary to the established law of this State that utilities are not insurers." Id. at 374.
Plaintiff correctly points out, however, that Black did not address the issue of strict liability; rather, it was decided solely on plaintiff's allegation of negligence. Id. at 372. Although no New Jersey cases addressing the issue of strict liability have been cited by the parties, and the court has not found any, authority exists in other jurisdictions that strict liability is not applicable in cases of injury due to contact with overhead power transmission lines; rather, in such cases the liability of the utility is measured in terms of negligence. In McGarry v. United States, 370 F. Supp. 525 (D.Nev. 1973), plaintiff was injured while operating a rig when the mast of the rig came in contact with an overhead power line. In assessing the liability of the Atomic Energy Commission, which maintained the power lines involved in the accident, the court held that (at 541) "[although] the standard of care may be of the highest nature, it is clear that the basis of liability is negligence and is not strict or absolute liability." Other jurisdictions passing upon this issue are in accord that an electric company's liability for injuries caused by contact with high-voltage transmission wires must be predicated upon negligence and not strict liability in tort. See Lorence v. Omaha Public Power Dis., 191 Neb. 68, 214 N.W.2d 238 (Sup.Ct. 1974); Donovan v. Union Electric Co., 454 S.W.2d 623 (Mo. Ct. App. 1970); Hedges v. Public Service Co. of Indiana, Inc., 396 N.E.2d 933 (Ind. App.Ct. 1979); Vieths v. Ripley, 295 N.W.2d 659 (Minn.Sup.Ct. 1980); Mosby v. Southwestern Elec. Power Co., 659 F.2d 680 (5 Cir.1981); Ford v. Georgia Power Co., 151 Ga. App. 748, 261 S.E.2d 474 (App.Ct. 1979); Wood v. Public Service Co. of New Hampshire, 114 N.H. 182, 317 A.2d 576 (Sup.Ct. 1974); Bogle v. Duke Power Co., 27 N.C. App. 318, 219 S.E.2d 308 (App.Ct. 1975); Bates v. Cleveland Elec. Illuminating Co., 171 N.E.2d 548 (Oh.App.Ct. 1961); Rice v. Florida Power & Light Co., 363 So.2d 834 (Fla.App. 1978); Wray v. *135 Benton Cty. Public Utility Dist., 9 Wash. App. 456, 513 P.2d 99 (App.Ct. 1973).
The cases in which liability for electricity is restricted to the traditional principles of negligence, however, confront only the situation where the electricity is being transmitted over high tension wires for ultimate availability to the consuming public. The transmission of electricity, as well as the transmission of other similar type consumable goods, is a service being rendered by the utility to prospective purchasers. While being transmitted, liability is controlled by standards of negligence and not strict liability, since any injury sustained as a result thereof is causally connected only to the transmission or transportation service and is unrelated to the ultimate sale of the product. The liability of those engaged in the business of providing transportation services to third-party "trespassers" on the public right of way has traditionally been founded on the law of negligence. See Latzoni v. Garfield, 22 N.J. 84 (1956); Lumley v. West Jersey & Seashore R. Co., 118 N.J.L. 140 (E. & A. 1937); Piver v. Pennsylvania R. Co., 76 N.J.L. 713 (E. & A. 1908). This analysis has been applied to limit the liability of an electric company to the established principles of negligence where its transmission lines were touched in the public right of way. See Rogers v. Georgia Power Co., 118 Ga. App. 527, 164 S.E.2d 268 (App.Ct. 1968); Kulhanjian v. Detroit Edison Co., 73 Mich. App. 347, 251 N.W.2d 580 (App.Ct. 1977).
Where, however, the electricity is no longer in transmission in the public right of way, but has been introduced into the stream of commerce by a sale thereof or otherwise, the liability of the electric company is no longer dependent upon a showing of negligence but may be based upon a product liability cause of action unrelated to fault. Elgin Airport Inn, Inc. v. Commonwealth Edison Co., 88 Ill. App.3d 477, 43 Ill.Dec. 620, 410 N.E.2d 620 (App.Ct. 1980); Ransome v. Wisconsin Elec. Power Co., 87 Wis.2d 605, 275 N.W.2d 641 (Sup.Ct. 1979); Kulhanjian v. Detroit Edison Co., 73 Mich. App. 347, 251 N.W.2d 580 (App.Ct. 1977); *136 Buckeye Union Fire Ins. Co. v. Detroit Edison Co., 38 Mich. App. 325, 196 N.W.2d 316 (App.Ct. 1972).[2]
In Ransome v. Wisconsin Elec. Power Co., supra, the owners of a home which was destroyed by fire as a result of an electricity overload caused when lightning struck a pole transformer, brought a strict liability action against an electric company. In evaluating the factual allegations the Supreme Court of Wisconsin held that once electricity is introduced into the stream of commerce, it is to be considered a "product" for the purposes of a products liability action, and the principles of strict liability in tort are applicable. Precedent requiring an electric company's liability be grounded upon negligence was specifically limited to those situations where the electricity had not yet been placed in the stream of commerce. Id. 275 N.W.2d at 648. The court categorized electricity as a product for strict liability purposes because it can be produced, confined, controlled, transmitted and distributed in the stream of commerce. The Wisconsin court recognized that the distribution of electricity might well be a service, but the electricity itself, in the contemplation of the ordinary user, is a consumable product. Although the court found that the sale of electricity takes place at the meter where charges are generally computed, social policy was noted to justify the imposition of strict liability when the product is merely placed into the stream of commerce. It is the opinion of this court that, while a sale is sufficient to place a product into the stream of commerce, a sale is not an absolute prerequisite to a finding that a product has been placed in the stream of commerce. Electricity may enter the stream of commerce when the electric company relinquishes exclusive control *137 over its product. See Petroski v. Northern Indiana Pub. Service Co., 171 Ind. App. 14, 354 N.E.2d 736, 747 (1976).
In Elgin Airport Inn, Inc. v. Commonwealth Edison Co., 88 Ill. App.3d 477, 43 Ill.Dec. 620, 410 N.E.2d 620 (App.Ct. 1980), plaintiff brought suit for damages to his air conditioner caused by low voltage electricity, alleging that the electricity was a "defective product" justifying the imposition of strict liability. The court stated that since electricity "is artificially manufactured, can be measured, bought and sold, changed in quantity or quality, delivered wherever desired and [is subject to] larceny, we are of the opinion that it is a product within the meaning of section 402 A." Id. 43 Ill.Dec. at 624, 410 N.E.2d at 624
The Michigan Court of Appeals has also found the principles of products liability to be applicable to the "product" of electricity, albeit under the implied warranty theories. Kulhanjian v. Detroit Edison Co., 73 Mich. App. 347, 251 N.W.2d 580 (App.Ct. 1977); Buckeye Union Fire Ins. Co. v. Detroit Edison Co., 38 Mich. App. 325, 196 N.W.2d 316 (App.Ct. 1972).
It is the holding of this court that the principles of strict liability in tort, as well as the implied warranties of merchantability and fitness for particular use, are applicable in cases where injuries are sustained from electricity placed in the stream of commerce. While a sale is conclusive as to the placement of the product in the stream of commerce, evidence that an electric company relinquished exclusive control over its product may establish strict liability at a point prior to its running through a meter where charges are computed. Inasmuch as a factual issue exists as to sale as well as the exclusive control of defendant over the actual wire touched by plaintiff with his voltage testing equipment, summary judgment, as requested, must be denied. A jury question exists as to the control and dominance over the aerial drop line, the spliced line running through the conduit pipe, and the exact place at which plaintiff touched the carrying source to receive the electric current. Even if the wire immediately above the meter is found *138 to be within the exclusive control of defendant, there is testimony to the effect that plaintiff placed his voltage tester "on the lugs cutting in, on the top of the switch", thereby raising an additional factual question as to whether the lug nuts on the top of the meter (if that is where plaintiff touched electric current) are sufficiently within the meter charging unit to conclude that a sale of the electricity had already taken place.
NOTES
[1] The court notes that the factual positions taken by the parties in their briefs may be considered supportive of their respective causes or admissions against interest, depending upon the theory of liability to which they are applied. Defendant P.S.E. & G. contends that all electrical equipment inside the switchhouse was owned, controlled and maintained by Whippany with the exception of the meter and related equipment. This position may be consistent with defendant's defenses to the claim of negligence, yet mitigates towards a finding of strict liability in that it tends to establish that the electricity was in the stream of commerce at the time of the accident. Similarly, plaintiff Aversa contends that the entire switchhouse was either owned, maintained or controlled and dominated by defendant P.S.E. & G. While this position may be consistent with plaintiff's claim of negligence, it mitigates against a finding of strict liability in that it tends to establish that the electricity was not in the stream of commerce at the time of the accident. The court will apply the established rule that all facts be construed in a light most favorable to the nonmoving party regardless of the origin of the factual issue. See Hume v. Bayer, supra; Bridgeton v. B.P. Oil Inc., 146 N.J.Super 169 (Law Div. 1976).
[2] In New Jersey the governing principles of strict liability in tort and the implied contractual warranties are theoretically identical. Dawson v. Chrysler Corp., 630 F.2d 950 (3 Cir.1980), cert. den. 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981); Huddell v. Levin, 537 F.2d 726 (3 Cir.1976). Authority concerning the applicability of either theory to electricity cases, therefore, will be considered equally persuasive.