**UNIVERSAL UNDERWRITERS
INSURANCE GROUP,
Plaintiff,**

v.

**PUBLIC SERVICE ELECTRIC &
GAS COMPANY, Defendant.**

**Civil Action No. 98cv1988(SSB).**

United States District Court,
D. New Jersey.

June 20, 2000.

Jeffrey C. Sotland, Mintzer, Sarowitz, Zeris & Ledva, Cherry Hill, NJ, for Plaintiff.

William E. Frese, Robert L. Sanchez, Newark, NJ, for Defendant.

## OPINION REGARDING PLAINTIFF UNIVERSAL UNDERWRITERS INSURANCE GROUP'S MOTION FOR SUMMARY JUDGMENT

BROTMAN, District Judge.

Presently before this Court, pursuant to 28 U.S.C. § 1332 (diversity of citizenship), is Plaintiff Universal Underwriters Insurance Group's Motion for Summary Judgment regarding its products liability and implied warranty claims against Defendant Public Service Electric & Gas Company ("PSE & G").

## I. FACTUAL & PROCEDURAL BACKGROUND

On April 8, 1997 a fire occurred which destroyed a building located in Woodbridge, New Jersey. As a result the Plaintiff was required to pay out over 2.5 million dollars to its insureds Jay & Jay Associates (the owner of the building), Hertz Corp. (a sublessor of the building) and Woodbridge Power Sports (the building's tenant). (*See* Pl.'s Br. at 1)

At about 6:30 p.m. on the evening of April 8th, employees of Woodbridge Power Sports ("WPS") allegedly smelled smoke and traced its origin to the main service panel located in the building's basement. (*See* Pl.'s Br. at 2) In response the owner of the building, Thomas Orlando, allegedly attempted to disconnect all electricity into the building by accessing a disconnect device located "after the main service panel." (*See id.*) The building's service manager purportedly then called the fire department, as well as WPS' private electrician. (*See id.*) [1]

Shortly thereafter WPS' electrician, Peter Tucker, arrived at the scene. Mr. Tucker allegedly inspected the basement and attempted to address the problem, but was ordered by the fire department to vacate the premises. (*See* Pl.'s Br. at 2) According to Plaintiff, the fire department informed Tucker that no one would be allowed to enter the building until PSE & G arrived. (*See id.*) At 7:29 p.m. the fire department notified PSE & G about the incident. (*See id.*)

At approximately 8:12 p.m., PSE & G trouble shooter John Morgan arrived at the scene. (*See id.*) Morgan concluded that it would be unsafe to disconnect the electric service by either cutting wires outside the building (*see* Def.'s Br. at 2; *see also* Dep. of John Morgan, attached as Ex. D to Certification of Jeffrey C. Sotland (hereinafter "Sotland Cert.") at 33) [2], or by cutting secondary switches on transformers.[3] (*See* Pl.'s Br. at 4) After Morgan communicated his assessment of the situation to a PSE & G dispatcher,[4] a traveling operator was sent to a substation located approximately one tenth of a mile from the building.[5] (*See* Pl.'s Br. at 5) The traveling operator, Charles McCord, shut the electricity off at approximately 9:00 p.m.

---

1. The parties dispute whether Defendant PSE & G was called at this time. (*Compare* Pl.'s Br. at 2 *with* Def.'s Reply Br. at 2)

2. WPS' engineer disagrees with Morgan's opinion, claiming instead that the wires could have been safely cut. (*See* Dep. of Peter Tucker, attached as Ex. E to Certification of Jeffrey C. Sotland, Esq. (hereinafter "Sotland Cert."))

3. Although Morgan contends that he was taught not to cut electricity by the use of secondary switches, this assertion appears disputed by PSE & G's supervisors. (*Compare* Morgan Dep. attached as Ex. D to Sotland Cert. *with* Dep. of Harold Izzo, attached as Ex. F to Sotland Cert.)

4. It appears that PSE & G's dispatcher, Ed Joswick, may have erroneously informed Morgan that there was no primary electric cut-out for the building outside the substation. (*Compare* Dep. of Harold Izzo, attached as Ex. F to Sotland Cert. *with* Dep. of Ed Joswick, attached as Ex. I to Sotland Cert.)

5. The traveling operator, Charles Mc Cord, claims that he was delayed by the police department at a roadblock. (*See* Dep. of Charles Mc Cord, attached as Ex. L to Sotland Cert., at 15)

(*See id.* at 6) By the time the electricity service to the building was discontinued, smoke and flames were emanating from the premises. (*See* Dep. of John Morgan, attached as Ex. D to Sotland Cert., at 46)

Asserting that the damage resulting from the fire would have been prevented had PSE & G properly trained its employees and implemented appropriate response procedures, the Plaintiff filed suit against PSE & G in this Court in April of 1998. The lawsuit alleges counts of negligence, strict liability and breach of warranty against the Defendant. (*See generally* Compl.) The Plaintiff now brings this motion for summary judgment, claiming that it is entitled to judgment as a matter of law with respect to its strict liability and implied warranty claims.

## II. STANDARD FOR SUMMARY JUDGMENT

The standard for granting summary judgment is a stringent but surmountable one. That is, summary judgment is appropriate only when the materials of record "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Serbin v. Bora Corp.,* 96 F.3d 66, 69 n. 2 (3d Cir.1996). In deciding whether there is a disputed issue of material fact, the court must grant all reasonable inferences from the evidence in favor of the non-moving party. *Serbin,* 96 F.3d at 69 n. 2. The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Supreme Court decisions mandate that a motion for summary judgment must be granted unless the party opposing the motion "provides evidence 'such that a reasonable jury could return a verdict for the non-moving party.'" *Lawrence v. National Westminster Bank of New Jersey,* 98 F.3d 61, 65 (3d Cir.1996) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). Moreover, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must "by affidavits or by depositions and admissions on file 'mak[e] a showing sufficient to establish ... [that a genuine issue of material fact exists as to each] ... element essential to that party's case.'" *Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.,* 812 F.2d 141, 144 (3d Cir.1987) (declaring that a non-movant may not "rest upon mere allegations, general denials, or ... vague statements"). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

## III. DISCUSSION

### a) *Plaintiff's Product Liability Claim*

In count two of the complaint, Plaintiff asserts a strict products liability claim against PSE & G. (*See* Compl. at Count Two) Actions grounded in the principles of products liability law have been codified by the legislature in New Jersey's Products Liability Act ("NJPLA"), which applies to "any claim or action brought by a claimant for *harm caused by a product,* irrespective of the theory underlying the claim[.]" *See* N.J. Stat. Ann. § 2A:58C–1(b)(3)(West 1987)(emphasis added). New Jersey courts interpreting the Act have consistently held that, as a general rule, common law actions for negligence and breach of implied warranty are subsumed by the NJPLA when the claims asserted fall within the act's purview. *See e.g., Potwora v. Grip,* 319 N.J.Super. 386, 725 A.2d 697, 704 (1999); *Tirrell v. Navistar Int'l, Inc.,* 248 N.J.Super. 390, 591 A.2d

643, 647–48 (1991); *Walus v. Pfizer, Inc.;* 812 F.Supp. 41, 43 (D.N.J.1993); *see also Repola v. Morbark Indus., Inc.,* 934 F.2d 483, 492 (3d Cir.1991)(applying New Jersey law). Thus, when the NJPLA applies to a plaintiff's cause of action, "the surviving cause of action is one of strict liability[.]" *Tirrell,* 591 A.2d at 647 n. 5.

■ The basis of Plaintiff's products liability claim against PSE & G is that a design defect rendered the product unreasonably unsafe. Specifically the design defect alleged by the Plaintiff is PSE & G's "failure to have procedures and properly trained [personnel] which directly affects the safety of the product at issue." (*See* Pl.'s Br. at 8 n. 2) However the facts that Plaintiff cites in support of this assertion focus not on any defect inherent in the product itself, but rather in PSE & G's alleged failure to act promptly and efficiently in shutting off its electrical service.

■ Although neither the New Jersey Supreme Court nor the appellate division have addressed the issue of whether an electric company may be held strictly liable under the NJPLA,[6] the Court need not address this important legal issue because it finds that the conduct complained of by the Plaintiff is not cognizable under the Act. In *Ridenour v. Bat Em Out,* 309 N.J.Super. 634, 707 A.2d 1093, 1097 (1998), New Jersey's appellate division held that a negligence standard applied to claims related to the maintenance and installation of a change making machine.[7] In addition to the negligent maintenance and installation claims raised against the owner and provider of the machine, the *Ridenour* court permitted the plaintiff to pursue a failure to warn claim under the NJPLA. *See id.* at 1096. By so doing the appellate division implicitly recognized that claims related to the maintenance of a product fell outside the scope of New Jersey's Product Liability Act, which subsumes all common-law negligence claims grounded upon injuries resulting from defective products. Were the *Ridenour* court to conclude that claims based on improper maintenance and installation were actionable under the NJPLA,

---

6. The Plaintiff cites to *Aversa v. Public Service Electric and Gas Co.,* 186 N.J.Super. 130, 451 A.2d 976 (N.J.Super.L.1982), in support of its argument in favor of strict liability. However *Aversa* is not an appellate division case, and therefore offers little guidance to the Court. *See Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1373 & n. 15 (3d Cir.1996)(explaining that when a state's highest court has not addressed the question presented, a federal court sitting in diversity may look to the decisions of *intermediate appellate courts* for guidance). Additionally, the Court fails to see how *Aversa* supports Universal's argument. In *Aversa,* the court held that the principles of strict liability in tort apply to electricity once it is placed in the stream of commerce. *See Aversa,* 451 A.2d at 980. The *Aversa* court reasoned that the stream of commerce included the point at which "the electric company relinquished exclusive control over its product." *Id.* Here the alleged defect relates to PSE & G's purported failure to adequately train and implement procedures regarding the operation and maintenance of *equipment that it owns* and therefore has *exclusive control* over. While Plaintiff contends that once the electricity passes through wires designated solely for the building it enters into the stream of commerce and is subject to strict liability, this argument does not appear supported by *Aversa,* which focused upon the ownership of the wires, not the exclusivity of the electricity's destination. *See id.* at 977 n. 1 (explaining that application of strict liability principles hinged upon the determination of who owned, controlled and maintained the equipment in question).

7. The *Ridenour* case was subject to the law of the NJPLA prior to its 1995 amendment. *See Ridenour,* 707 A.2d at 1096. In 1995 the Act was amended to extend liability under the Act to "product sellers." *See* N.J.S.A. 2A:58C–8 (West Supp.2000). However this subsequent amendment has no effect on the holding of *Ridenour* because the appellate division found that, notwithstanding the lack of a statutory directive, New Jersey common-law mandated the application of the NJPLA to the claims against the defendant. *See Ridenour,* 707 A.2d at 1096–97. This conclusion is supported by *Thomas v. Ford Motor Co.,* 70 F.Supp.2d 521, 530 (D.N.J.1999), holding that the 1995 amendment to the NJPLA did not abrogate *Ridenour* and other cases holding that when the injury complained of is not the result of a defect in the product, a negligence standard applies. 70 F.Supp.2d 521, 530 (D.N.J.1999).

the negligence claim would have been subsumed by the Act. Thus *Ridenour* makes it clear that actions based upon conduct related to the improper installation and maintenance of a product are not subject to strict tort liability.

Here the Court finds that the claim asserted by the Plaintiff is not related to a defect in the product (i.e. the electricity), but rather to the maintenance and oversight of PSE & G's emergency response service. This conclusion is supported by an examination of Plaintiff's brief[8] and expert reports,[9] which do not allege that the fire was caused by any defect in the electricity, but rather by PSE & G's failure to promptly discontinue electrical service to the building. Because this conduct relates to the maintenance of the electrical service, and not a defect inherent in the product, it does not qualify as "harm caused by a product" and is therefore not cognizable under the NJPLA. *See Potwora v. Grip*, 319 N.J.Super. 386, 725 A.2d 697, 704 (1999)(concluding that when an injury does not result from a defective product, but rather from a service, the NJPLA is inapplicable because the plaintiff's claim is "not 'for harm caused by a product' within the meaning of the Act"); *see also Ridenour*, 707 A.2d at 1097 (holding that claims of improper maintenance and installation are governed by negligence law, not the NJPLA).

A similar result was reached in *Thomas v. Ford Motor Co.*, 70 F.Supp.2d 521 (D.N.J.1999). In *Thomas*, the district court held that a claim for negligent installation of an airbag was not governed by the NJPLA. *See id.* at 529. The court explained that the Act applied only to injuries resulting from defective products, not to those which were caused by improper conduct related to a product's installation. *See id.* at 530. The Court finds that the rationale of *Thomas* applies with equal force here, where the alleged conduct relates to the termination (as opposed to installation) of the electrical service; in both cases the alleged injury is not caused by a defect in the product itself, but by the service attendant to its use.

In addition, the Court finds this decision consistent with the underlying purpose of the NJPLA. In *Zaza v. Marquess and Nell, Inc.*, the New Jersey Supreme Court explained that the NJPLA "has been interpreted as evincing a legislative policy 'to limit the expansion of products-liability law.'" 144 N.J. 34, 675 A.2d 620, 627 (1996)(quoting *Roberts v. Rich Foods, Inc.*, 139 N.J. 365, 654 A.2d 1365, 1369 (1995)). Expanding the scope of the Act to include instances similar to the present case would drastically increase the liability of manu-

8. The Plaintiff's brief does not state that the electricity was defective but rather that PSE & G's procedures and training related to its emergency response service were defective. (*See* Pl.'s Br. at 8 n. 2)(identifying the design defect as PSE & G's "failure to have procedures and properly trained [personnel] which directly affects the safety of the product at issue") Additionally the brief identifies PSE & G's allegedly insufficient response to the shut-off request as the cause of the fire. (*See* Pl.'s Br at 2)(explaining that "[h]ad PSE & G responded in a timely manner, with a competent troubleshooter, and taken appropriate action upon arrival, this fire would not have occurred")

9. The Defendant submitted three expert reports. Plaintiff's first expert, Louis H. Gahagan, opines that "[i]n summary, this incident was controllable in its early stages had PSE & G responded to the needs of fire service personnel in a timely and prudent manner." (*See* Expert Report of Louis H. Gahagan, attached as Ex. M to Sotland Cert., at 3) The report of Austin Bollen, P.E. similarly states that "this fire was the direct result of the failure of PSE & G to 'disconnect promptly' the electrical service to the building." (*See* Expert Report of Austin Bollen, P.E., attached as Ex. N to Sotland Cert., at 5) Lastly an analysis of the "conclusions" of Clifford B. Patton, P.E., reveals that they likewise focus not on any defect in the electricity itself, but rather in the alleged inadequacy of PSE & G's response. (*See* Expert Report of Clifford B. Patton, P.E., attached as Ex. O to Sotland Cert., at 4) The Court also notes that Patton's report asserts that the fire was initiated by a loose connection in the equipment, not by any defect inherent in the electricity. (*See id.*)

749

facturers and product sellers by effectively removing the statutory requirement that the harm be caused by a defect in the product. This the Court refuses to do. As a result the Plaintiff's motion for summary judgment regarding its strict liability claim is denied. Because the Court has determined that the conduct complained of by the Plaintiff does not fall within the purview of the Act, it need not address whether the NJPLA may, under a different set of circumstances, apply to electric service providers.

### b) Plaintiff's Implied Warranty Claim

■ Count three of Plaintiff's complaint asserts an implied warranty claim against PSE & G. In *Dawson v. Chrysler Corporation,* the Third Circuit observed that "under the law of New Jersey, the governing principles of strict liability and the implied warranty theory are identical." 630 F.2d 950, 955 (3d Cir.1980); *see also Heavner v. Uniroyal,* 63 N.J. 130, 305 A.2d 412, 426–27 (1973)(explaining that when a party seeks to recover in tort for consequential physical injury and property damages, the action sounds in strict liability "and no advantage can be gained by pleading [it] in terms of breach of [an implied] warranty").[10] Given that these claims are premised upon the same underlying principles, it follows that the Court's determination that the conduct complained of fails to state a valid basis for a strict products liability claim necessarily precludes the Plaintiff from asserting a similar claim under an implied warranty theory. Therefore Plaintiff's motion for summary judgment is denied as to its implied warranty claim.

### IV. CONCLUSION

For the reasons stated above, the Plaintiff's motion for summary judgment is denied.

The Court will enter an appropriate order.

10. Plaintiff's brief concedes that under New Jersey law the principles governing strict liability and implied warranty are identical, and

### ORDER ON PLAINTIFF UNIVERSAL UNDERWRITERS INSURANCE GROUP'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER having come before the Court on Plaintiff Universal Underwriters Insurance Group's motion for summary judgment regarding Plaintiff's strict liability and implied warranty claims against Defendant Public Service Electric & Gas Company;

The Court having considered the parties' submissions; and

Having heard argument on the matter on the 6th of June, 2000;

For the reasons set forth in the Court's opinion of this date;

**IT IS** on this day 20th day of June, 2000 HEREBY

**ORDERED** that the Plaintiff's motion for summary judgment is **DENIED.**

No Costs.

that only the terminology has changed. (*See* Pl.'s Br. at 14 –15)