**Elizabeth A. DARLING, Daniel Darling, Rebecca Caffery and Susan Caffery v. CENTRAL VERMONT PUBLIC SERVICE CORPORATION**

[762 A.2d 826]

No. 98-519

September 21, 2000. Plaintiffs Elizabeth and Daniel Darling, and Rebecca and Susan Caffery (the Darlings), appeal from a judgment entered in Windsor Superior Court following a jury verdict in favor of defendant Central Vermont Public Service Corporation (CVPSC). According to the Darlings, electricity escaped from nearby storm-damaged power lines, set fire to their rented house and garage, and destroyed all of their personal belongings. The Darlings sued CVPSC, alleging negligence and strict product liability.* The court refused to instruct the jury to apply the doctrine of strict product liability, and the case was sent to the jury solely on the theory of negligence. The jury returned a special verdict finding the Darlings seventy-seven percent negligent and CVPSC twenty-three percent negligent. Consequently, the court entered judgment for CVPSC. See 12 V.S.A. § 1036 (comparative negligence); *Howard v. Spafford*, 132 Vt. 434, 438, 321 A.2d 74, 76 (1974) (under 12 V.S.A. § 1036, contributory negligence bars recovery where plaintiff's negligence exceeds fifty percent of total causal negligence). On appeal, the Darlings contend that the court erred by refusing to instruct the jury to apply the doctrine of strict product liability. We affirm.

On the night of January 19, 1996, a tree limb fell across three 7200-volt power lines and one neutral line located between 600 and 1,800 feet from the Darlings' rented house. The tree limb, lying across the live wires while still attached to the tree trunk, created an alternative ground that released current at approximately 7200 volts into the earth.

CVPSC had a safety system in place to prevent release of such fault, or escaping,

current. Either excessive voltage flowing back from the tree trunk along the neutral line should have tripped a circuit breaker on a preceding pole, or the escaped current taken back to the circuit breaker by ground rods in the delivery system should have tripped it. Neither method, however, triggered the breaker, which failed to stop the current. Instead, the current traveled into and along the wet earth.

According to the Darlings, the current flowed into their metal well casing, into which their house was also grounded with a copper grounding wire. The Darlings further contend that the current traveled into their garage through the copper grounding wire. They claim that the continuous and excessive current overloaded their electrical wiring and appliances, causing their garage and house to catch on fire. The garage and house, including most of the Darlings' personal belongings, were completely destroyed.

CVPSC, however, contends that the fire was caused by a space heater in the garage which the Darlings had left plugged in and that this situation was further exacerbated by a damaged extension cord linking the garage to the house wiring.

The Darlings sued CVPSC, alleging negligence based on the failure of CVPSC's neutral and ground rod circuit breaker system. They also alleged strict product liability, contending that because CVPSC failed to control its "product," the electricity crossed into the house wiring system in a defective and unreasonably dangerous condition. The trial court refused to instruct the jury on the doctrine of strict product liability, concluding that the Darlings had not met their burden of proving that the electricity was defective and unreasonably dangerous. The Darlings appealed to this Court.

To be entitled to a jury instruction, a plaintiff "must establish a prima facie case on each of the elements" of its theory

---

* The Darlings also raised a claim of strict liability for ultra-hazardous activities. It is not clear whether the court dismissed this claim or whether the Darlings voluntarily withdrew it. That claim, however, is not before us.

of the case. *State v. Knapp*, 147 Vt. 56, 59, 509 A.2d 1010, 1011 (1986). In *Zaleskie v. Joyce*, 133 Vt. 150, 333 A.2d 110 (1975), we adopted the doctrine of strict product liability set forth in the Restatement (Second) of Torts, the elements of which are as follows:

> (1) One who *sells any product* in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

*Id.* at 154, 333 A.2d at 113 (emphasis added).

CVPSC argues that the Darlings cannot establish a prima facie case of strict product liability because (1) electricity is a service, not a product, (2) even if electricity is a product, CVPSC did not "sell" the electricity alleged to have caused the fire, (3) even if electricity is a product and CVPSC sold the electricity alleged to have caused the fire, the electricity was not in a defective condition. Furthermore, CVPSC argues that public policy concerns counsel against applying strict product liability to electricity. Finally, CVPSC contends that contributory and comparative negligence applies in strict product liability cases, and thus, because the jury found the Darlings seventy-seven percent negligent, even if the court had instructed the jury to apply strict product liability, the Darlings could not recover.

Some courts have held that, as a matter of law, electricity is a service, not a product, and therefore, strict product liability can never apply in cases involving electricity. See *Otte v. Dayton Power & Light Co.*, 523 N.E.2d 835, 839 (Ohio 1988) ("Consumers . . . . are not paying for individual products but for the privilege of using [the electric company's] service."); *Bowen v. Niagara Mohawk Power Corp.*, 590 N.Y.S.2d 628, 631-32 (App. Div. 1992). Most courts, however, have held that electricity is a product for purposes of strict product liability. See *Smith v. Home Light & Power Co.*, 734 P.2d 1051, 1057 (Colo. 1987) ("electricity that has reached a location in the distribution system where it is . . . delivered to a consumer is a product for purposes of § 402A"); *Ransome v. Wisconsin Elec. Power Co.*, 275 N.W.2d 641, 643 (Wis. 1979). In this case, we need not reach the question of whether electricity is a service or a product because we hold that, even if electricity is a product, CVPSC did not sell the electricity alleged to have caused the fire.

Courts have formulated two main tests to determine whether electricity has been "sold" for the purposes of strict product liability. Under the meter test, the electricity must have passed through the customer's meter along the regularly wired pathway into the house to be quantified before it is considered "sold." See *Bryant v. Tri-Country Elec. Membership Corp.*, 844 F. Supp. 347, 350 (W.D. Ky. 1994) ("Although identifying the moment of sale is a . . . challenging task, a reasonable consensus prevails: electricity is typically held to be 'sold' when it passes through the customer's meter. It is at this moment that the customer's charges are computed, the seller relinquishes control over its product, and the electricity has been reduced to a voltage suitable for ordinary use."); *Ransome*, 275 N.W.2d at 643 ("The 'sale' of electricity takes place at the meter where charges are generally computed.").

Under the stream-of-commerce test, courts concerned about the inflexibility of

the meter test look to whether electricity has been placed in the stream of commerce for use by the consumer, rather than whether a technical sale has occurred. See *Petroski v. Northern Indiana Pub. Serv. Co.*, 354 N.E.2d 736, 747 (Ind. Ct. App. 1976) ("[T]he test is not whether there has been a technical sale but rather whether the product has been placed in the stream of commerce."); *Public Serv Indiana, Inc. v. Nichols*, 494 N.E.2d 349, 355 (Ind. Ct. App. 1986) ("Electricity is considered to be placed into the stream of commerce when it reaches its destination in a home or factory.").

Courts applying the stream-of-commerce test follow one of two approaches in order to determine if electricity has been placed in the stream of commerce. Under the marketable-voltage approach, electricity is considered in the stream of commerce when the current has been stepped down from its transmission voltage to the 110/220 voltage which is of use to the customer. See *id.* ("[E]lectricity must be in a marketable and marketed state at the time it causes the injury . . . meaning that it has been reduced from a transmission voltage to a consumption voltage."); *Priest v. Brown*, 396 S.E.2d 638, 641 (S.C. Ct. App. 1990) (strict product liability denied because "the electricity through these lines was of such high a voltage that it was not in a form immediately usable by a consumer.").

Under the relinquishment-of-control approach, electricity is considered in the stream of commerce when the utility company has relinquished exclusive control over the current. See *Monroe v. Savannah Elec. & Power Co.*, 471 S.E.2d 854, 857 (Ga. 1996) ("[R]elinquishment of control over electricity and/or the marketable condition of that electricity are essential factors in determining whether the electricity had been placed in the stream of commerce by the manufacturer for purposes of strict liability."). In *Aversa v. Public Serv. Elec. & Gas Co.*,

451 A.2d 976 (N.J. Super. Ct. Law Div. 1982), the plaintiff was injured when he tested the voltage of a wire running through the "switchouse" where the power company's electricity tied into the plaintiff's employer's wiring. See *id.* at 977. The question for the jury in *Aversa* was who had control and dominance over the dropline, a spliced line, and the exact place the plaintiff touched the carrying source to receive the electric current. The court determined that, "[w]hile a sale is conclusive as to the placement of the product in the stream of commerce, evidence that an electric company relinquished exclusive control over its product may establish strict liability at a point prior to its running through a meter where charges are computed." *Id.* at 980. In relinquishment-of-control cases, the relevant question is whether the consumer has control over the equipment. If the consumer has control over the equipment, the utility company has relinquished exclusive control over the electricity, and the electricity has been placed in the stream of commerce. See *id.* at 977 n.1. If the consumer does not have control over the equipment, the utility company has not relinquished exclusive control over the electricity, and the electricity has not been placed into the stream of commerce. See *id.*

In this case, applying the meter test, the stream-of-commerce test, or the relinquishment-of-control test, the electricity that allegedly caused the fire had not been sold. As previously noted, the Darlings contend that the electricity escaped from storm-damaged transmission lines and traveled through the earth before entering their home through the ground wire connected to their well casing. It is undisputed that the electricity did not pass through the Darlings' electrical meter, that the electricity was never at a marketable voltage, and that the storm-damaged power lines were not within the Darlings' control.

Because CVPSC did not sell the electricity that allegedly caused the fire in this case, the trial court correctly refused to instruct the jury to apply the doctrine of strict product liability.

*Affirmed.*