Leslie **ADEL** and Joanne **Adel** Plaintiffs,

v.

**GREENSPRINGS OF VERMONT, INC.,** Dennis Glennon, Thomas Cross, and Robert Rubin Defendants.

No. 2:02–CV–21.

United States District Court, D. Vermont.

Jan. 28, 2005.

2

Jerome Frederick O'Neill, Esq., O'Neill Kellner & Green, P.C., Burlington, VT, for Plaintiffs.

Thomas Peter Simon, Esq., McCormick, Fitzpatrick, Kasper & Burchard, Burlington, VT, for Defendants.

## OPINION AND ORDER

SESSIONS, Chief Judge.

### I. Introduction

The controversy here arose after plaintiff Leslie Adel suffered from a severe case of Legionnaires' disease shortly after returning from a ski vacation in Vermont. Leslie Adel alleges that he contracted Legionnaires' disease from a water supply maintained by the defendants. Together with his wife Joanne, he brings this action alleging negligence and strict liability. The defendants have moved for summary judgment on all counts of the complaint (Doc. 78). For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

### II. Background

#### A. The Parties

Plaintiffs Leslie and Joanne Adel are a married couple from Vineland, New Jersey. Defendant Greensprings of Vermont, Inc. ("Greensprings") is a Vermont corporation with its principle place of business in Vermont. Greensprings owns and operates the Greenspring at Mt. Snow resort in West Dover, Vermont.

Defendant Dennis Glennon ("Glennon") is the president of Greensprings and he fulfills duties similar to those of a general manager. Defendant Robert Rubin

("Rubin") was employed by defendant Greensprings from approximately 1992 through 2002. He remains a member of the Greensprings' board. During 1999, Rubin had primary responsibility for the water system at the Greensprings complex. Among other duties, Rubin was responsible for the maintenance and testing of the water supply.

Defendant Thomas Cross is a self-employed management consultant. He appears to have had little involvement with events relevant to this lawsuit. The plaintiffs have agreed that all claims against Thomas Cross may be dismissed.

## B. Facts

Because this case is now before the Court on the defendants' motion for summary judgment, the following facts are undisputed or construed in the light most favorable to the plaintiffs.

Together with their two children and eight friends, Leslie and Joanne Adel went on a ski vacation in southern Vermont from February 3 through February 7, 1999. The vacationers stayed in Unit 24 at Greenspring.[1] Greenspring is a townhouse condominium owned by Thomas and Charlene Fallarco. The townhouse condominium is part of a larger complex developed by defendant Greensprings. Greensprings owns and maintains the water supply for the Greenspring condominiums. Greensprings also owns and maintains common areas of the complex such as a swimming pool and spa at the Greenspring recreation center. While he was in Vermont, Leslie Adel ("Adel") used the swimming pool and spa at the Greenspring recreation center as well as the bathrooms, showers and a bathtub jacuzzi in Unit 24.

On February 9, 1999, two days after he returned from his ski vacation, Adel began to experience flu-like symptoms. Unfortunately, his condition steadily worsened and he was transferred to the Hospital of the University of Pennsylvania on February 16.

On February 17, a physician took a sputum specimen from Adel's lungs. The hospital laboratory cultured *Legionnella pneumonphila* from that specimen on February 23. As a result, Adel was diagnosed as suffering from Legionnaires' disease. Adel was hospitalized at the Hospital of the University of Pennsylvania for six weeks. His bout with Legionnaires' disease was serious and included 45 days in a coma. Adel claims to have suffered permanent injuries as a result of contracting Legionnaires' disease.

On February 23, 1999, Nancy Thayer of the epidemiology division of the Vermont Department of Health ("DOH") received a report that Adel had Legionnaires' disease. Ms. Thayer began an investigation into the possible sources of Adel's illness.

The primary means of transmission of Legionnaires' disease is the inhalation of aerosolized water droplets containing the *Legionnella pneumonphila* bacteria. The incubation period for Legionnaires' disease is usually between 2 and 14 days. Thus, Adel's Vermont vacation fell within the potential incubation period. *See* Clancy Expert Report (Doc 79, Ex. A).

On February 24, 1999, the DOH sent sanitarian Alfred Burns ("Burns") to Greenspring to collect swabs and water samples. Burns collected 33 samples from locations at the Greensprings complex. These included seven samples from the spa in the recreation center and nine samples from inside unit 24. Of all the samples taken, two returned positive tests for *Legionella pneumophila.* The positive tests were from a jug of water collected

---

1. Note that Greenspring is not the same entity as defendant Greensprings of Vermont, Inc..

from a bathroom on the lower floor of unit 24 and a jug of water collected in the upstairs master bathroom in Unit 24. DOH Laboratory Microbiology Report (Doc. 79, Ex. B).

Burns also inspected the spa in the recreation center. This inspection revealed many deficiencies. Burns found that there was no written operating manual as required by DOH regulations. Similarly, there was no written log of hourly and weekly tests. More seriously, the free chlorine/bromine levels were not within the required range of between 2 and 5 parts per million. Burns found a free chlorine/bromine level of 0.00 parts per million. Burns gave the spa an overall rating of unsatisfactory. *See* DOH Public Spas and Hot Tubs Inspection Report (Doc. 82, Ex. 12).

On June 7, 1999, the DOH sent cultures from the positive samples from Unit 24 to the United States Centers for Disease Control and Prevention ("CDC") for further testing. On June 24, 1999, the CDC performed a test known as monoclonal antibody subtyping. This test revealed that both cultures were *Legionella pneumophila* serogroup 1, monoclonal antibody pattern 1,2,5,6. *See* CDC Test Results (Doc. 79, Ex. D). The CDC also tested a culture from the sputum specimen taken from Adel on February 17, 1999. On August 3, 1999, the CDC identified that culture as *Legionella pneumophila* serogroup 1, monoclonal antibody pattern 1,2,5,6. *See* CDC Test Results (Doc. 79, Ex. E).

The plaintiffs have disclosed Dr. Jennifer Clancy ("Clancy") as an expert on liability and causation. Clancy concludes that "[t]o a reasonable degree of scientific certainty, negligent operation and mainte-

nance of the Greensprings water system caused the growth of legionellae in the system and the subsequent infection of Mr. Adel." Clancy Expert Report at 9 (Doc. 82, Ex. 3). In support of her view that Greensprings was negligent in maintaining the water system, Clancy points to evidence of reporting violations, failures to conduct required testing, inadequate well vents and inadequate storage overflow at Greensprings.[2] *Id.* at 9. The defendants claim that this evidence is insufficient to support a conclusion that any negligence on their part led to the presence of *Legionella* in the Greensprings water supply. Clancy's opinions are discussed in detail in the accompanying Opinion and Order: Daubert Issues dated January 28, 2004 (Doc. 90). In that Order, the Court finds that Clancy's proposed testimony is admissible under Fed.R.Evid. 702.

The defendants have disclosed Dieter Gump, M.D. ("Gump") as an expert. Gump's testimony is discussed in more detail in the accompanying order regarding expert testimony. Gump claims that there is inadequate evidence in this case to conclude with a reasonable degree of medical probability that Adel contracted Legionnaires' disease from the water supply at Greensprings. The Court has found that Gump's proposed testimony is admissible under Fed.R.Evid. 702.

Greensprings owns and operates the water system that provides water to the Greenspring apartment complex and to the public recreation center. Although this water system is privately owned, it is regulated by the State of Vermont as a public system.

---

2. The plaintiffs had indicated that they also intended to use evidence of a 1991 outbreak of Legionnaires' disease at the Greensprings complex as evidence of the defendants' negligence. The plaintiffs have conceded that there is insufficient evidence to establish that there was an earlier outbreak. Thus, they will not raise this issue at trial.

Apartment owners at Greenspring have water meters at their apartments. They do not get billed according to the meter readings, however. Greensprings sends a monthly bill to the Greenspring at Mt. Snow Homeowners' Association for all of its water services. The Homeowners' Association then sends a bill to each condo owner. These bills are calculated on a per-capita basis.

In 1999, Rubin had primary responsibility for the water system at the Greensprings complex. Among other duties, Rubin was responsible for the maintenance and testing of the water supply. Defendant Glennon is licensed as a water system operator by the State of Vermont. He acquired this license so that there would be someone available with a license if other operators left Greensprings. Nevertheless, Glennon did not play any direct role in managing the water supply and he did not closely supervise Rubin's work in this regard.

## III. Summary Judgment Standard

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court may not grant summary judgment if a disputed fact exists that might affect the outcome of the suit under controlling substantive law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The burden is on the moving party to demonstrate the absence of a genuine issue of material fact, and in considering the motion, the court must resolve all ambiguities and draw all inferences in favor of the nonmoving party. *Gallo v. Prudential*

*Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994).

## IV. Discussion

### A. Strict Liability

In Counts II and III of the Complaint, the plaintiffs bring claims of strict liability. Count II alleges a breach of the warranty of merchantability. This is a contract-based claim under Vermont's version of the Uniform Commercial Code (UCC). *See* Vt. Stat. Ann. tit. 9A § 2–314 (2004). Count III alleges a breach of the duty to warn. This is a tort-based strict products liability claim. *See* Restatement (Second) of Torts § 402A, cmt. j (1965).

The defendants argue that these counts must be dismissed. In support of this position, the defendants raise two closely related arguments. First, the defendants argue that they cannot be held strictly liable because that are not "sellers" of water within the meaning of either Restatement (Second) of Torts § 402A (1965) or Vt. Stat. Ann. tit. 9A § 2–314 (2004). Second, the defendants claim that water is not a "good" under the Uniform Commercial Code (UCC) definition found at Vt. Stat. Ann. tit. 9A § 2–105(1) (2004). Essentially, the defendants' position is that strict liability cannot be applied to a public water system such as that operated by Greensprings. For the reasons that follow, the Court finds that strict liability can be applied in this case.

### 1. The Warranty of Merchantability

■ A warranty of merchantability is implied only "if the seller is a merchant with respect to goods of that kind." Vt. Stat. Ann. tit. 9A § 2–314 (2004). The Vermont Supreme Court has not decided whether a water supplier is a "seller" of a "good" under Vermont's version of the UCC. This Court must therefore predict how the Vermont Supreme Court would

rule if it were faced with this question. *Lawson v. Fisher–Price, Inc.,* 191 F.R.D. 381, 383 (D.Vt.1999). This is a difficult task as decisions from other state courts are divided. Nevertheless, the Court is persuaded by the reasoning of those decisions finding that water suppliers are sellers of goods under Article 2 of the UCC.

The Court and the parties have identified eight cases that consider whether water suppliers are sellers of goods under Article 2 of the UCC. Six courts have held that water is a good and that water suppliers are merchants. *See Dakota Pork Indus. v. City of Huron,* 638 N.W.2d 884, 886 (S.D.2002); *Mulberry–Fairplains Water Ass'n, Inc. v. Town of North Wilkesboro,* 105 N.C.App. 258, 412 S.E.2d 910, 915 (1992); *Sternberg v. N.Y. Water Serv. Corp.,* 155 A.D.2d 658, 548 N.Y.S.2d 247, 248 (N.Y.App.Div.1989); *Gall v. Allegheny County Health Dep't,* 521 Pa. 68, 555 A.2d 786, 789 (1989); *Zepp v. Mayor & Council of Athens,* 180 Ga.App. 72, 348 S.E.2d 673, 677–78 (1986); *Moody v. City of Galveston,* 524 S.W.2d 583, 586–87 (Tex.Civ.App. 1975). In contrast, only two courts have held that the furnishing of water is not a sale of goods under the UCC. *See Mattoon v. City of Pittsfield,* 56 Mass.App.Ct. 124, 775 N.E.2d 770, 784 (2002); *Coast Laundry, Inc. v. Lincoln City,* 9 Or.App. 521, 497 P.2d 1224, 1227–28 (1972). Thus, a clear majority of the jurisdictions that have considered the issue hold that water is a good under the UCC.

■ The situation is less clear when we turn to the question of whether water suppliers can be held liable for a breach of the warranty of merchantability. The issue is complicated by the fact that two courts have held that, even though the furnishing of water is covered by the UCC, the warranty of merchantability does *not* apply. *See Dakota Pork,* 638 N.W.2d at 886–87; *Sternberg,* 548 N.Y.S.2d at 248. The Court finds the reasoning of these cases very unpersuasive. In *Sternberg,* the court followed, without any further analysis, *Canavan v. City of Mechanicville,* 229 N.Y. 473, 128 N.E. 882 (N.Y.1920). *Sternberg,* 548 N.Y.S.2d at 248. However, *Canavan* does not even consider the UCC, which is unsurprising considering that it was decided many decades prior to New York's adoption of the UCC. As *Sternberg* simply relies on *Canavan,* it provides little guidance on the scope of the UCC's warranty of merchantability. *Dakota Pork* is also unpersuasive. The *Dakota Pork* court follows *Sternberg* and *Canavan* without noting that this line of cases rests on authority that predates the UCC.[3] *See Dakota Pork,* 638 N.W.2d at 887.

This Court rejects the approach of *Dakota Pork* and *Sternberg.* If the furnishing of water is covered by Vermont's version of the UCC then the warranty of merchantability should apply. The statute clearly states that "[u]nless excluded or modified (§ 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Vt. Stat. Ann. tit. 9A § 2–314 (2004). Thus, if a seller of water is a merchant with respect to water, there is an implied warranty. The statute provides no basis to grant a special exemption for sellers of water.

**3.** The court also claimed that it had "been cited to no authority nor have we found any holding there is an express or implied warranty of merchantability or fitness for a particular purpose in connection with the sale and supply of water." *Dakota Pork,* 638 N.W.2d at 887. By 2002, however, two courts had found that there is an implied warranty of merchantability in these circumstances. *See Gall,* 555 A.2d at 789–90; *Moody,* 524 S.W.2d at 588.

This means that the key issue is whether or not sellers of water are merchants with respect to water. As noted above, a majority of courts have found that they are. Nevertheless, the defendants ask the Court to follow the recent decision by the Appeals Court of Massachusetts in *Mattoon*. The *Mattoon* court held that water providers are not merchants because the provision of water is primarily the rendition of services rather than the sale of goods. 775 N.E.2d at 783–84.

The *Mattoon* court argued as follows:

Here, the city did not create or manufacture the water. Rather, the city, by a system of reservoirs, captured the water from brooks, streams, and rainfall. It treated the water and then distributed it to its citizens. Although the city charged a sum for the water, that rate reflected the cost of storage, treatment and distribution. Thus, it is clear that the predominant factor, thrust, or purpose of the activity was the rendition of services and not the sale of goods.

*Mattoon*, 775 N.E.2d at 784. The defendants claim that this argument can be applied directly to the facts of this case. Just like the city in *Mattoon*, the defendants merely captured, treated and distributed the water. Thus, the defendants ask the Court to conclude that they were simply providing a service.

There are a number of reasons for rejecting the reasoning of *Mattoon*. First, the argument starts with an irrelevant premise. An item can be a "good" under the UCC even if the seller did not create or manufacture it. This is made clear by Vt. Stat. Ann. tit. 9A § 2–107 (2004) which provides that "[a] contract for the sale of minerals or the like (including oil and gas) . . . to be removed from realty is

a contract for the sale of goods within this article if they are to be severed by the seller." *See also Gall*, 555 A.2d at 789 n. 2 (noting that crude oil is considered a good under Article 2 of the UCC); Restatement (Second) of Torts § 402A, cmt. e (noting that strict liability could apply to someone who sold a toxic mushroom). Thus, *Mattoon* is incorrect in so far as it suggests that water is not a good because it is captured rather than manufactured. Moreover, even if this were a relevant factor, the defendants alter the water when they treat it.

*Mattoon* also places undue emphasis on the fact that the cost of water reflects the cost of storage, treatment and distribution. The provision of goods always includes service elements such as storage and distribution. Thus, all sellers of goods will incur such costs and water providers are not unique in this regard.

The Supreme Court of Pennsylvania has taken a better approach to this question. *See Gall*, 555 A.2d at 788–90. When deciding whether water is a "good" under Article 2 of the UCC, the *Gall* court focused on the UCC's definition of "good." *See id.* at 789. Under the UCC, " 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." Vt. Stat. Ann. tit. 9A § 2–105 (2004).[4] Water satisfies these requirements. As the *Gall* court notes, "[a]ll who have paid bills for water can attest to its movability." *Gall*, 555 A.2d at 789. In this case, the defendants extract water from an underground aquifer. Thus, their sale may also qualify as a sale of goods under Vt. Stat. Ann. tit. 9A § 2–107 which provides that the "the sale of minerals or the like (including oil

4. Pennsylvania's version of the UCC has an identical definition of "goods." 13 Pa. Cons. Stat. § 2105 (2004).

and gas)" is a sale of goods within Article 2 of the UCC.

The defendants regularly provide water to the homeowners at the Greensprings complex. These homeowners pay for the water on a per-capita basis. As water is a good, the defendants are merchants with respect to water. Vt. Stat. Ann. tit. 9A § 2–104(1). Thus, a warranty of merchantability is implied in the defendants' sale of water. Vt. Stat. Ann. tit. 9A § 2–314 (2004). Consequently, the defendants are not entitled to summary judgment on Count II of the complaint.

### 2. Products Liability

■ Under Vermont law, it is well-settled that sellers "may be liable in strict liability or negligence to ultimate users for bodily injury or harm to other property caused by a defective product." *Mainline Tractor & Equip. Co., Inc. v. Nutrite Corp.*, 937 F.Supp. 1095, 1101 (D.Vt.1996). Vermont has adopted the doctrine of strict liability as set forth in the Restatement (Second) of Torts § 402A (1965). *See Zaleskie v. Joyce*, 133 Vt. 150, 154, 333 A.2d 110, 113 (1975). "Liability for breach of warranty under the [UCC] is congruent in nearly all respects with the principles expressed in Restatement (Second) of Torts § 402A (1965), which defines the strict liability of a seller for physical harm to a user or consumer of the seller's product." *Mattoon*, 775 N.E.2d at 783 (quotation marks and citation omitted).

■ To be held strictly liable for the physical harm caused by a product, the defendants must be "engaged in the business of selling such a product." *Zaleskie*, 133 Vt. at 154, 333 A.2d at 113 (quoting Restatement (Second) of Torts § 402A(1)(a) (1965)). The defendants argue that water is not a product within the meaning of the Restatement (Second) of Torts § 402A (1965) because providing wa-

ter is a service. As explained above, the Court rejects the view that providing water should only be seen as a service. Thus, the defendants are "engaged in the business of selling" water for the purposes of strict liability. *See* Restatement (Second) of Torts § 402A, cmt. f. (1965) (noting that the limitation of § 402A to those engaged in the business of selling such a product is analogous to the limitation of § 2–314 of the UCC to merchants). As a result, the defendants are not entitled to summary judgment on Count III of the complaint.

This conclusion finds further support from cases considering whether electricity is a product or a service. As is the case with water, courts are split on this question. Although the Vermont Supreme Court has not ruled on the issue, in *Darling v. Central Vt. Pub. Serv. Corp.*, 171 Vt. 565, 567, 762 A.2d 826, 828 (2000) the court noted that "[m]ost courts ... hold that electricity is a product for purposes of strict product liability." Thus, this Court's holding that the sale of water is not a service is consistent with the weight of authority on the related issue of whether electricity is a service or a product.

### B. Negligence

The defendants have also requested summary judgment on Count I of the complaint which alleges negligence. The defendants argue that the plaintiffs' case for negligence relies on inadmissible evidence. In particular, the defendants object to expert testimony of Dr. Jennifer Clancy ("Clancy"). The plaintiffs intend to use this testimony to show negligence and causation. The defendants argue that the plaintiffs cannot show negligence or causation because this testimony does not satisfy the requirements of Fed.R.Evid. 702.

The Court has considered the admissibility of Clancy's testimony in the accom-

panying Memorandum and Order: Daubert Issues dated January 28, 2004 (Doc. 90). In that Order, the Court holds that Clancy's expert testimony is admissible. As this testimony is admissible, the Court must consider it in the light most favorable to the plaintiff. *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Considered in this light, Clancy's testimony offers sufficient support for the plaintiffs' negligence claim.

## C. The Individual Defendants

Finally, the individual defendants seek summary judgment on the grounds that, under Vermont law, they cannot be held personally liable in this case. The plaintiffs agree that Thomas Cross is entitled to summary judgment. However, they claim that Robert Rubin and Dennis Glennon can be held liable as they are personally responsible for the torts in this case.

 Under Vermont law, "a corporate officer may be held liable for a tort in which the officer personally participated even though the corporation may also be held liable." *Secretary v. Upper Valley Regional Landfill Corp.,* 167 Vt. 228, 243, 705 A.2d 1001, 1010 (1997). Thus, Rubin and Glennon cannot avoid liability simply because they were acting within their capacities as officers. Nevertheless, the plaintiffs must set forth "facts to establish that the defendants personally participated in the transaction causing [the] injury." *Stuart v. Fed. Energy Sys., Inc.,* 596 F.Supp. 458, 461 (D.Vt.1984); *see also Parker v. Cone,* 104 Vt. 421, 425, 160 A. 246, 248 (1932) (a corporate officer "is not personally liable for torts ... unless he specifically directed them to be done, or participated or co-operated therein"). The plaintiffs have only satisfied this burden with respect to Rubin.

The evidence shows that Rubin was the person responsible for the water supply at Greensprings at the relevant time. Rubin was directly responsible for the both the maintenance and testing of the water supply. Thus, any negligence in this regard can be attributed to him personally. In contrast, Glennon did not have any direct role regarding the water supply. Although Glennon is licensed as a water system operator by the State of Vermont, he was not involved in operating the water supply at any time relevant to this lawsuit. The plaintiffs argue that he should be held liable because he failed to adequately supervise Rubin. However, this does not rise to the level of individual participation required for personal liability. *See Stuart,* 596 F.Supp. at 461; *see also Wolf Designs, Inc. v. DHR Co.* 322 F.Supp.2d 1065, 1072 (C.D.Cal.2004). Thus, Glennon is entitled to summary judgment.

## V. Conclusion

For the reasons stated above, the defendants' Motion for Summary Judgment (Doc. 78) is GRANTED IN PART and DENIED IN PART. The Court grants summary judgment to Thomas Cross and Dennis Glennon on the plaintiffs' claims against them. In all other respects, the motion is denied.